Richard C. BRANDON, Appellant,

v.

STATE of Alaska, Appellee.

No. A–2362.

Court of Appeals of Alaska.

July 28, 1989.

---

Rex Lamont Butler, Anchorage, for appellant.

Cynthia M. Hora, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Before BRYNER, Chief Judge, COATS, Judge, and ROWLAND, Superior Court Judge.*

OPINION

COATS, Judge.

Richard C. Brandon was convicted, following a jury trial, of two counts of assault in the first degree, AS 11.41.200(a)(1), (a)(2), and of one count of kidnapping. AS 11.41.300(a)(1)(C). Superior Court Judge Ralph E. Moody sentenced Brandon to twenty years of imprisonment on the two assault in the first degree convictions, and to fifteen years, consecutive, on the kidnapping conviction. Brandon's total sentence is thirty-five years of imprisonment. Brandon appeals his conviction and sentence. We reverse the conviction.

On March 1, 1987, Joyce Brandon arrived at the Abused Women's Aid in Crisis (AWAIC) shelter at approximately 6:00 p.m. She had been severely beaten over her entire body. She reported to counselor Kay White that her husband, Brandon, had beat her throughout the day. Joyce Brandon told White that she had escaped when Brandon took their three-year-old son, R.B., to McDonalds.

White conducted an intake interview with Joyce Brandon that lasted approximately forty-five minutes. White described Joyce as being "very upset," and said that Joyce was crying. She described Joyce as having a swollen face, one eye almost swollen shut, and said that she "appeared to be severely beaten." White stated that areas of Joyce's entire body were bruised and swollen and that Joyce appeared to be in pain. Joyce told White that Brandon began beating her at about 8:00 a.m. that day and that he had just recently stopped. Joyce stated that her husband had hit her with his hands, feet, and a belt. She said that Brandon had tied her to a broom handle and had tied her hands behind her back. White urged Joyce to go to the hospital. Joyce was initially reluctant, but ultimately agreed to go with White.

White took Joyce Brandon to Humana Hospital. There Joyce initially saw nurse Linda Kile. Joyce Brandon made statements to Kile implicating Joyce's husband, Brandon, in the beating. Joyce made her

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

statement to Kile around 7:30 p.m., approximately one and one-half hours after Joyce had arrived at AWAIC.

Joyce was examined by Dr. Claman at the Humana Hospital Emergency Room at about 7:30 p.m. Joyce told Dr. Claman that she had been beaten throughout the day and that she was restrained during the beatings. Doctor Claman testified that Joyce had undergone a severe beating. Doctor Claman also testified that Joyce's injuries fell within the legal definition of serious physical injury.

Anchorage Police Officer Kathy Brewster and Reserve Officer Rhea Ferranti were dispatched to the hospital to talk to Joyce Brandon. The officers contacted Joyce at approximately 8:00 p.m. Officer Brewster took a taped statement from Joyce at 9:55 p.m. The statement was a summary of an approximately two-hour interview that the officers had conducted with Joyce Brandon. Officer Brewster had Joyce Brandon sign a consent to search form, authorizing Anchorage Police Officers to search the Brandon residence. The consent form authorized the police to search for and seize several items connected with the alleged assault. Joyce Brandon told Officer Brewster that she was concerned that her husband might also beat R.B., whom she had left with Brandon.

Officers Gifford, Gilliam, and Daily proceeded to the Brandon residence with the consent to search form. The officers knocked on the door, and the door was opened by Brandon. Officer Daily entered the house first and handcuffed Brandon. The officers then proceeded to search the residence. The police found a broom handle, a belt, nylons, and other items which were ultimately entered in evidence at Brandon's trial.

R.B. was at the Brandon residence during the police search. Sergeant Gifford testified that R.B. was running around, engaging in "[a] normal child's actions[.]" Officer Daily described R.B. as "nice, talkative." When Officer Daily found a broken broom, R.B. stated that the broom "had been broken while Daddy had been spanking Mommy." Sergeant Gifford reported that R.B. made a similar statement in his presence.

The state presented the case against Brandon to the grand jury, seeking indictments for assault in the first degree and for kidnapping. Joyce Brandon testified before the grand jury, but she testified that she had been beaten by another man, not by Brandon. However, the grand jury concluded that there was sufficient evidence to indict Brandon on both the assault and the kidnapping charges.

At Brandon's trial, Joyce Brandon exercised her fifth amendment rights and refused to testify. However, the statements that Joyce Brandon had made shortly after the alleged offense to White, Kile, and Officers Brewster and Ferranti were admitted in evidence as "excited utterances." A.R.E. 803(2). In addition, Judge Moody found that R.B. was unavailable as a witness, but allowed his statements to the police officers to be admitted under the special residual exception to the hearsay rule. A.R.E. 804(b)(5). The jury ultimately convicted Brandon of both the assault and the kidnapping charges.

## SEARCH OF BRANDON'S HOUSE

■ Brandon argues that the trial court erred in failing to suppress evidence which was derived from the search of the Brandon residence. The state argues that the police were authorized to search the Brandon residence because Joyce Brandon consented to the search. Brandon essentially argues that Joyce Brandon's consent to search was not effective because he was the only adult present at the residence and did not agree to allow the police to search.

In *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), the defendant was arrested in the yard of the house where he lived. The police were admitted into the house by a Mrs. Graff who stated that she and the defendant jointly occupied the house. Graff allowed the police to search the house, and the police found money taken in a robbery. The court stated that it was clear that:

[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premise or effects sought to be inspected.

*Id.* at 171, 94 S.Ct. at 993 (footnote omitted). The court stated in a footnote:

Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.* at 171 n. 7, 94 S.Ct. at 993 n. 7 (citations omitted).

In *Matlock,* however, the court also stated that "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *Id.* at 171, 94 S.Ct. at 993. Courts and commentators appear to be split regarding what circumstances allow the police to search a premises based upon the consent of a third party cotenant when the defendant cotenant is present on the premises and objects to the search. W. LaFave, *Search and Seizure* § 8.3(d), at 248–53 (1987); *compare United States v. Hendrix,* 595 F.2d 883 (D.C.Cir.1979) (wife could consent to search of premises over objection of husband who had beaten and threatened her and fired a gun out of the window, forcing her to leave the premises) *with Silva v. State,* 344 So.2d 559 (Fla. 1977) (when defendant attacked the woman he was living with, her consent to a search was invalid where he refused to consent to the search).

Even assuming that under some circumstances the present cotenant can object to a search of the premises, we believe that in this case the police could rely on Joyce Brandon's consent to search the Brandon residence. Joyce Brandon had recently been severely beaten. She authorized the police to go to her residence to obtain evidence of the beating. She also expressed concern for the welfare of her three-year-old son. Joyce Brandon had authority to allow the police both to go to her house and to enter the house. It would be impractical and unreasonable for us to require the police to have Joyce Brandon accompany them. Given the recency and severity of the beating, it was reasonable for the police to proceed promptly to the Brandon residence. The police did not know whether Brandon would be home when they arrived. If Brandon were not at home, Joyce Brandon's consent to search would clearly have been effective. Because the police encountered Brandon at the residence, it was necessary for them to arrest Brandon or face the possibility that he would destroy evidence.

Once Brandon was arrested, it would be possible for us to require the police to guard the residence and obtain a search warrant. However, we see no reason why Joyce Brandon, having an equal right to possession of the premises, could not consent to a search of the residence. Because the police already had Joyce Brandon's consent to search, we conclude that the police were authorized to search the residence after Brandon's arrest. We therefore uphold Judge Moody's decision refusing to suppress the evidence in this case.

## JOYCE BRANDON'S AND R.B.'S STATEMENTS

Brandon next argues that Judge Moody erred in admitting Joyce Brandon's statements implicating Brandon. These statements were made to White, to Kile, and to Officers Brewster and Ferranti. Judge Moody admitted these statements as excited utterances under Alaska Evidence Rule 803(2).

Rule 803 provides in part that:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(2) *Excited Utterance.* A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

The Commentary to Rule 803(2) states:

The theory of Subdivision (2) is simply that circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication. Spontaneity is the key factor in each instance, though arrived at by somewhat different routes. Both are needed in order to avoid needless niggling.

. . . .

With respect to the time element, Subdivision (1) recognizes that in many, if not most, instances precise contemporaneity is not possible, and hence a slight lapse is allowable. Under Subdivision (2) the standard of measurement is the duration of the state of excitement. "How long can excitement prevail? Obviously, there are no pat answers and the character of the transaction or event will largely determine the significance of the time factor."

Evidence Rules Commentary, Rule 803 (citations omitted).

A trial court's decision that a statement is an excited utterance depends on the facts of the case and should not be reversed unless clearly erroneous. *Lipscomb v. State*, 700 P.2d 1298, 1306 (Alaska App. 1985). In the *Lipscomb* case, a man by the name of O'Donnell was robbed by Lipscomb. O'Donnell managed to free himself about five minutes after Lipscomb left O'Donnell's apartment and immediately went down to the lobby and called the police. *Id.* at 1305. Officer LaSage knocked on O'Donnell's door within five minutes after the call. O'Donnell immediately told LaSage that he had been robbed and related the basic facts of the robbery. LaSage called Detective Nielsen, who arrived about one-half hour after LaSage. Nielsen then questioned O'Donnell, who gave Nielsen essentially the same account that he had given to LaSage. *Id.* at 1306. This court concluded that the statements which O'Donnell made to LaSage shortly after the robbery were admissible as excited utterances. However, we concluded that the latter statements which O'Donnell made to Nielsen were not admissible as excited utterances. We stated:

The startling event in this case was the robbery. O'Donnell's initial statements, as related at trial by LaSage, were spontaneous and concerned the startling event itself. They were made during O'Donnell's first contact with anyone besides the person who answered the telephone at the police station. O'Donnell apparently believed that Lipscomb had a gun and was prepared to use it if O'Donnell resisted. While O'Donnell was a mature adult, and the robbery did not involve unnecessary violence, the event taken as a whole (including the experience of being bound) could well have produced a state of excitement lasting until LaSage's arrival shortly thereafter.

. . . .

By contrast, statements by O'Donnell about what was taken and the precise order of events during the robbery by their narrative nature, the fact that they were in response to police questioning, and that they were more remote in time from the robbery itself are more properly characterized as the product of reflective thought than excited utterances. This is especially true of O'Donnell's statements to Detective Nielsen, who arrived some thirty minutes after LaSage. *Id.* at 1307.

■ Using *Lipscomb* as a starting point, we conclude that Joyce Brandon's initial statements to White could be properly classified as excited utterances. According to the evidence produced at trial, Joyce Brandon had been beaten and was restrained by Brandon over a period of several hours. She went to the AWAIC shelter as soon as it was practical for her to do so. According to White, when she first saw Joyce

Brandon, Joyce was extremely upset although not hysterical. She had obviously been severely beaten. Joyce was upset and crying, fearful, and in great pain. Joyce Brandon told White that she had just been beaten and had just managed to get away. Given this testimony, the trial court could find that "the declarant's condition at the time was such that the statement was spontaneous, excited or impulsive rather than the product of reflection and deliberation." *United States v. Iron Shell*, 633 F.2d 77, 86 (8th Cir.1980), *cert. denied*, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981).

■ White testified that she told Joyce Brandon that she should go to the hospital. Joyce was reluctant to go because she was fearful that her husband would find her there. Eventually, White talked Joyce Brandon into going to the hospital and transported her there. According to White, Joyce Brandon was at the AWAIC center for about forty-five minutes before White drove her to the hospital. Given the passage of time and the earlier conversation with White, it does not appear that Joyce Brandon's later statements could properly be classified as spontaneous, excited, or impulsive. Although we believe that all of the statements Joyce Brandon made to White were admissible, Joyce Brandon's later statements cannot be classified as excited utterances.

The state contends that in the event we find Joyce Brandon's statements to White admissible, Joyce Brandon's later statements would be cumulative and therefore admission of these statements would be harmless error. We will deal with the state's harmless error contention after addressing another issue that Brandon raises.

■ Brandon argues that Judge Moody erred in allowing the police officers who searched Brandon's residence to testify to statements allegedly made by R.B. According to Sgt. Gifford, while he was searching the Brandon residence, R.B. picked up a broom and said, "This is what Daddy spanked Mommy with." According to Officer Daily, when he found the broom at the Brandon residence, R.B. stated that the broom "had been broken while Daddy had been spanking Mommy." Daily testified that he then asked where this occurred and the boy said, "in the living room," and pointed down to the living room floor. Judge Moody found that R.B.'s statements to Gifford and Daily were admissible under Evidence Rule 804(b)(5), the residual or catch-all exception to the hearsay rule. He concluded that the statements were similar to excited utterances.

Rule 804 provides in part that:

(b) *Hearsay Exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(5) *Other Exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

The state first argues that R.B.'s statements were admissible as excited utterances under Rule 803(2). As we have previously stated, Rule 803(2) defines an excited utterance as, "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." By the time the police arrived at the Brandon residence, at least six hours had passed since Brandon allegedly beat Joyce. The police who arrested Brandon and searched

the apartment described the actions of R.B. as being typical for a child R.B.'s age: he ran around the residence, played, said a few things, and got in the way. There is absolutely no indication that R.B. was still affected by any stress of excitement caused by allegedly witnessing his father beating his mother.

The state argues that R.B. was acting under the excitement of the arrest of his father and the fact that he had not seen his mother or older brother for six hours. Under Rule 803(2) it is questionable whether excitement caused by this later event can be used to admit in evidence an excited utterance relating to the earlier event. In any case, there is little evidence that R.B. was acting under the stress of excitement when he made the statements in question. We also note that Judge Moody did not find that the statements of R.B. were excited utterances. Judge Moody apparently found that the statements were not excited utterances because he admitted them under Rule 804(b)(5).

On appeal the state does not argue that R.B.'s statements were admissible under Rule 804(b)(5). However, we will explore this ground for admission because it is the ground advanced by Judge Moody. The commentary to Evidence Rules 803(23) and 804(b)(5), the residual exceptions to the hearsay rule, indicates that these exceptions are to be used only under exceptional circumstances where the court finds guarantees of trustworthiness equivalent to or exceeding the guarantees reflected in the present exceptions to the hearsay rule. From the commentary, it appears that it was anticipated that the residual exceptions were to be used rarely. We note that Judge Moody did not make any findings, other than that the statements were similar to excited utterances, concerning the admission of R.B.'s statements. The state has not argued that there is any reason to find that R.B.'s statements were so trustworthy that they should be admitted under a residual exception to the hearsay rule. We see no particular reason to admit these statements, which do not appear to qualify as excited utterances, under the residual exception given the record in this case.

The state argues, however, that Brandon has waived his right to argue that R.B.'s testimony is inadmissible hearsay or that his confrontation rights were violated because the trial court found that the defendant was responsible for R.B.'s unavailability. The state, in addition to pointing out findings that the trial court made in this regard, also cites substantial federal authority which allows the admission of prior testimony or statements of witnesses when the trial court finds that the defendant is responsible for the unavailability of the witness. *See, e.g., United States v. Smith,* 792 F.2d 441, 442 (4th Cir.1986) (where district court found by clear and convincing evidence that defendant had procured a witness' absence from the trial, the court could properly admit a statement which the witness had formerly given to the police which implicated the defendant), *cert. denied,* 479 U.S. 1037, 107 S.Ct. 892, 93 L.Ed.2d 844 (1987); *United States v. Potamitis,* 739 F.2d 784, 787 (2nd Cir.) (grand jury testimony permitted at trial where trial court found that the father of one of the co-conspirators was responsible for the witnesses unavailability), *cert. denied,* 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 269 (1984); *United States v. Mastrangelo,* 693 F.2d 269, 273–74 (2nd Cir.1982) (if defendant had participated in the death of a witness, the witness' grand jury testimony could be admitted against the defendant at trial because, "Bare knowledge of a plot to kill [the witness] and a failure to give warning to appropriate authorities is sufficient to constitute a waiver[;]" government has burden of proving waiver by a preponderance of the evidence); *United States v. Thevis,* 665 F.2d 616 (5th Cir.) (defendant who causes a witness to be unavailable for trial by preventing the witness from testifying waives right to confrontation and to object on hearsay grounds; government has burden of proof on this issue by clear and convincing evidence), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982); *Steele v. Taylor,* 684 F.2d 1193, 1202 (6th Cir.1982); ("A prior statement given by a witness made unavailable by the wrongful conduct of a party is admissible against the

party if the statement would have been admissible had the witness testified."), *cert. denied,* 460 U.S. 1053, 103 S.Ct. 1501, 1502, 75 L.Ed.2d 932 (1983); *United States v. Carlson,* 547 F.2d 1346 (8th Cir.1976) (where defendant intimidated witness to assure witness' unavailability at trial, grand jury testimony of witness was admissible under Federal Evidence Rule 804(b)(5) and defendant waived his right to confront the witness), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977); *State v. Corrigan,* 691 P.2d 1311, 1315 (Kan.App. 1984) (prior statements of wife are admissible where court found that the defendant had procured the absence of his wife as a witness).

■ A major hurdle to the state's argument that Brandon waived his right to object to the hearsay statements of his son is that the state never made this waiver argument for admissibility of the statements in the trial court. Judge Moody never ruled that the statements were admissible on this basis. We are not aware of any case in this jurisdiction adopting the waiver theory so we cannot say that Brandon's counsel should have been aware of this possibility. Even though the trial court held a hearing and found that Brandon was involved in his son's unavailability, it does not seem appropriate to find that Brandon waived his hearsay and confrontation rights under these circumstances. Rather than ask for additional briefing on this issue or remand to the trial court for additional findings, we have instead decided to evaluate the erroneous admission of Joyce Brandon's statements to determine whether admission of those statements was reversible error. We find that we are unable to conclude that admission of Joyce Brandon's statements was harmless error.

Joyce Brandon was unavailable to testify. The state therefore attempted to convict Brandon based mainly on Joyce Brandon's pretrial statements implicating Brandon as the person who had assaulted her. Because of the critical importance of Joyce Brandon's statements to the state's case, the fact that several of her statements were erroneously admitted as excited utter-

ances could have had a substantial impact on the jury.

In *Nitz v. State,* 720 P.2d 55, 68–71 (Alaska App.1986), this court found reversible error where the trial court erroneously admitted out-of-court statements of a victim of a sexual assault as prior consistent statements. The court concluded that admission of the out-of-court statements as prior consistent statements was not harmless although the victim testified and one of her out-of-court statements was properly admitted as a first complaint. In part, our reasoning was that improper admission of the out-of-court statements tended to create the false impression that repetition added substance to the victim's story and that, where a number of witnesses are allowed to repeat the victim's statements, "The jury may be tempted to substitute the credibility of the third-party witnesses for the credibility of the victim." *Id.* at 70. Admission of Joyce Brandon's out-of-court statements through several different witnesses appears to be more prejudicial in this case than admission of the statement in *Nitz,* because in this case Joyce Brandon did not testify. Thus, Joyce Brandon's out-of-court statements implicating Brandon assumed great importance in this trial.

■ Courts in other jurisdictions have been reluctant to find harmless error where a complaining witness' out-of-court statement was erroneously admitted in evidence, even if the complaining witness testified. *See People v. Brown,* 170 Ill.App.3d 273, 120 Ill.Dec. 712, 718, 524 N.E.2d 742, 748 (1988) (Complaining witness testified that she was assaulted by defendant. Trial court erroneously admitted a hearsay statement which the victim made to the police shortly after the alleged offense. The appellate court concluded that the case was close and declined to find harmless error, ruling that the jury was likely to attach "disproportionate significance" to the complaining witness' out-of-court statements.); *State v. Mahoney,* 33 Or.App. 73, 575 P.2d 681, 683 (1978) (Complaining witness testified at trial that he was sexually assaulted by the defendant. Court found that erroneous admission of an alleged excited ut-

terance was harmful error.); *State v. Burgess*, 465 A.2d 204, 207 (R.I.1983) (Complaining witness testified at trial that she was raped by the defendant. Where trial court erroneously admitted the out-of-court statement of the complaining witness to a physician under both the medical history and the excited utterance exceptions to the hearsay rule, court found reversible error.). We accordingly conclude that the erroneous admission of several out-of-court statements by Joyce Brandon implicating Brandon was not harmless error. We conclude that Brandon's conviction must be reversed.[1]

The conviction is REVERSED.

---

1. Our disposition of this issue makes it unnecessary for us to decide the other issues that Brandon raises on his appeal, except for his contentions that the trial court erred in failing to dismiss the indictment against him and that the trial court erred in failing to grant Brandon's motion for acquittal on the kidnapping charge.

We conclude that Brandon's argument that the trial court erred in refusing to dismiss the indictment has not been adequately briefed. We accordingly refuse to consider this claim. Brandon attempts to incorporate by reference memoranda that he filed in the trial court. This does not comply with the Appellate Rules. *See* Appellate Rule 212; *Kristich v. State*, 550 P.2d 796, 804 (Alaska 1976); *Lewis v. State*, 469 P.2d 689, 691–92 n. 2 (Alaska 1970); *Bidwell v. Scheele*, 355 P.2d 584, 587 (Alaska 1960).

Brandon also argues that the trial court erred in failing to grant his motion for judgment of acquittal on the kidnapping charge. The state presented sufficient evidence at trial that Brandon restrained Joyce Brandon for several hours and beat her during this time. There was sufficient evidence for a jury to have found Brandon guilty of the kidnapping charge beyond a reasonable doubt. *See Reynolds v. State*, 664 P.2d 621, 627 (Alaska App.1983).